Morning, Illinois public court first district court is now in session. The 5th division, the Honorable Justice Thomas E. Hoffman citing case number 2 to dash 0 0 8 3 and Ray are a. Would the councils who are representing the parties and we're going to argue. Want to identify yourself please starting with the apple on. Attorney general Christina Hanson on behalf of the appellant. Okay, and who's there who's representing the police assistant public guardian cast plane for the children. I believe. And Thomas O'Connell, I represent the adoptive mother of JC and that's a case number 1 dash 22 dash 0343. All right, the time we've allotted for oral argument on this case is 30 minutes per side. And there'll be a 10 minute rebuttal argument. Mr. O'Connell, you'll get 5 of the 30 minutes to address your. Particular minor JC. And the remainder of the time will go on the guardian. Apple, you can commence your argument when you're ready. Hello? Yeah, I'm sorry. I. What having a bit of a technical difficulty. Well, we can hear you and see so begin your argument. Okay. May it please the court assistant attorney general Christina Hanson on behalf of appellant, the director of the Department of children and family services. And this consolidated appeal, the circuit court held the director and indirect civil contempt of court in 8 separate juvenile cases for failing to move. You think care who are psychiatrically hospitalized beyond medical necessity. And 1, who is in a trauma informed interim care center. And to clinically appropriate placements court ordered deadline. The court issued these contempt orders in each case, despite recognizing that each child had complex medical and clinical needs that made it difficult to find a placement that could safely provide appropriate care for the child. That the director's staff and agents were working diligently to try to find appropriate placements and that the process of placing using care with has been made difficult by a shortage of available. Placements, which the circuit court itself attributed to decisions, the past administration to close a number of residential facilities within the state. All 8 of these use have now been placed, but in each case, the court and post significant daily time. Until those placements occurred, the whole contempt was unwarranted in each case for 3 reasons. 1st, the department did not willfully and consummation to disregard court orders to place these use the law is clear that civil contempt is coerced. They're not punitive in nature. A court may impose contempt to to to coerce compliance by a party. By a party only for willful and consummation disregard of the court's orders. In other words, contempt is warranted only where the party has the ability to avoid contempt and also the ability to purge the contempt. Where the party cannot comply contempt is unwarranted and in these cases, the evidence is clear that the department. With making efforts and did not willfully and consummation they refused to comply with the court's orders. Well, there are 8 cases here. And so I think we're going to have to address what it was that the department was doing in order to place these children the date. The trial court entered his order, requiring adequate placement until the date. That the director was held in contempt. So you might as well start out and start telling us and my question is directed only to what you were doing after the entry of the order. Not before. Okay. I can start with the general proposition. The department was working with its providers to make referrals to place these using care and also concurrently working to to meet the needs of the youth while they were waiting for placement. With respect to our a. The order. With respect to our a. The proceedings were in December of 2021, the orders for placement were in December of 2021. December 9th and December 16th by that time, our a had been referred for placement at a number of residential facilities and he had been acceptance had been declined. And on that point, Miss Hanson, doesn't the evidence support. A finding that department was referring some of these children to placements that knew we're never going to accept them. So, it was sort of a, a, an idle gesture. No, because the placements to which the, to which the children were referred were considering the statement and the department was referring them and also having conversations with facilities about what kind of programming. What, what, you know, whether they could meet the child needs and whether there were additional resources that could help meet the child's needs. All right, to get case specific. It will appear that on the day that Smith was held in contempt, our a was on the wait list for chop. And hold it. That's correct. Yeah. Was our a referred to chop. And or Holyton after the entry of the trial courts order. He was referred to those facilities. After the initial round of facilities had declined placement, a psychological examination was ordered and no, that wasn't my question. It's a very, very simple question. Was he referred to either of those either or both of those institutions after the trial court entered its order. I believe so he was referred to the facilities on December 14. So, I believe that was after the December 9. That was after the December 9 order that that placement was to occur. Now, he was still under consideration by those 2. Facilities at the time of the. Hearing on contempt. Yeah. Did it both of those facilities and placed on the wait list and the director and the circuit court entered the contempt order and within a week of that contempt order or 8 days? I believe after the contempt order issue, he was placed at the at Martha's interim care center, which provides trauma informed interim care where he was receiving the services that he needed. Pending acceptance into 1 of those facilities. No, no, is there any question as to whether. Chop and is that how it's pronounced? We're adequate placements for. I'm sorry, what was the question? Is there any question on whether. Either chop or. We're considered to be adequate. Facilities for placement of this job. They were considered placements that could meet. That could meet needs and in fact, they go for placement. Okay. All right. What about. What about Jason? Well, what about. And what about JC? JC under care in September 2021, I'll have to buy the on medical necessity. And already medically and clinically traumatized with complex medical and psychiatric needs. So, she entered care when she was already, she was already hospitalized beyond medical necessity and she was initially approved for. She was. Initially placed in a victim can foster home, which is a non relative foster home with somebody that was familiar with the family and she was supposed to receive and the plan was for her to receive supportive services. There she, she was taken to the hospital almost immediately within hours of being placed there. She was taken to the hospital and struggled to sort of stabilize and care. So, at the same time, as the department, the department essentially undertook a concurrent plan to try to stabilize her with services in in temporary placement while it thought well, it's not a residential placement for her. So, like I said, she was initially approved for foster care, but her level of care became residential. Can you tell me just tell me specifically what the department did, you know, you said, try to stabilize her while it's found an appropriate placement. That's really general. I'd like to know something more specific. Well, with respect to her initial foster care placements that the plan was to implement intensive placement stabilization services. But she disrupted, she would disrupt in care and almost immediately about upon being placed. She, she eventually experienced the court found 24 movements because she would once placed in her temporary placement. She would. She would end up being taken to the emergency room because due to aggressive behaviors or self harming behavior. Let me ask you this, these, these children, obviously, they're in the system because they have all of these issues. So what I'm trying to understand is, if the kids have issues that are really difficult to handle, does that mean that. They shouldn't that appropriate placements can't be found for them. I mean, that kind of sounds like that's what you're saying that they were that this child was so disruptive that. It wouldn't be reasonable to expect the CFS to find an appropriate residential placement for her. Is that what you're ultimately arguing? No, we're not disputing that DCFS has an under the department have an obligation to find an appropriate clinically appropriate placement for these use only that it was unable to do so within the within the timeframe allotted by the circuit court within the timeframes in those orders. All right, let me, can I get specific on JC or we're never going to get through these eight. The order was entered on December 30 at 2021 and the department was ordered to remove JC from Lori's hospital by January 4 five days later and place her in a clinically appropriate placement within 24 hours. Now, after the December 30th 2021 order, what did the department do to place this child in an appropriate facility. Specifically, specifically is right. They made referrals to several she was referred to, they were three residential facilities that they believed could meet her needs that she would refer to and the evidence was that one of those facilities in the academy expected to have an opening for her. So, in the meantime, they were trying to stabilize her in temporary. My next question is on the date that. Smith was held in contempt. Were those 3 pending referrals. Still pending, or had she been refused from any of them. Those 3 referrals were still pending and undetermined and did they satisfy. Or recommended needs, I believe. So they were, they were considering her for placement. So they would have been, you know. At least still figuring out whether they could specifically provide her care. Okay. Now, what about TV? The order was entered. I think what February 3rd of 2022. Requiring that TV be placed. By 315 PM. On February 10th, what did the department do to place TV? After the entry of the February 3rd order. Again, TV has. Had been referred to residential, she referred to 8 residential facilities. Yeah, that was after the after the entry of the order. I don't have specifically whether they were, I don't we'd have to know because that's the issue that goes to willfulness. What did he do? Or did the DCF do. To place these children after the orders were entered. Well, at the contempt hearing. At the contempt hearing. Alicia testified that she was working directly with. Um, with their diagnostic program to to work with them to try to make space for. TV within their program, but that was a bad thing. When did that happen? That's what just was asking. That's what I'd like to know as well. Well, that was going on, she testified to that at the contempt hearing. So that was going on between the entry of the. Order to requiring placement and the contempt proceeding. And that's ultimately where TV was placed. Okay, what about what about AC? The order. The order on the AC was entered on January the 27th, 2022, and it ordered the AC be placed within 14 days. What did the DCF do after February the 10th? Until the contempt hearing on March the 3rd, the evidence that the contempt hearing on March the 3rd. So that the director had referred her to every available specialized foster care provider in the state. Now, that was after the entry of the order. Well, I mean, 2 at the time of the entry of the order 2 of the foster care specialized foster care agencies were actively still searching for foster homes. In fact, the public guardian, cast a representative, acknowledged that everybody was doing everything they could at that time to find a foster home. I would ask you to please answer the question specifically, because as Justice Hoffman pointed out before. We want to know what the director did specifically after the court entered its order. Not what people were doing generally before or at any other time. So, I want you to be specific. Did it happen? Yes. Let me finish. Please. Did it happen after the order was entered and what was it that they were doing? So, saying everyone was working diligently, I don't know what that means. I understand. That the court is asking about the relevant time period between the placement of the order and the relevant activity that was taking place in that period of time. I just wanted to point out that if the referrals to these agencies have already been made, and they are working to find 2 of them are still actively working to find. To find potential foster homes for her, it wouldn't necessarily require. They were following up with these agencies and pursuing, you know, and following up to let me, let me, let me post something to you if. Referrals had been in place before the court, the court order had been made and nothing had happened. I assume that the court had taken that into consideration. So I'd like to know what additional methods or additional activity took place after the court order was entered. Not what they were doing before. So you're talking about well, this was already pending. So they just continued pending. That's not what I'm asking. Did you do anything else after the court order was entered? That's what I'd like you to address. Okay, I don't know exactly when her efforts started, but at the contempt hearing testify that the department also started working with a statewide recruiter to identify a foster placement and evaluating non specialized foster homes, where it believes that it could provide services that would provide a safe foster care environment for and at the same time, the department had become aware of a potential foster parent that was out of state that that was a potential foster placement and so was pursuing that option as well. You see, I think all of that is interesting, but if that took place before the court entered its order, that means that all of those efforts had obviously hadn't worked. So the court wanted you to do something else. So, you know, I think it's interesting to tell us all of that, but the timing that justice often asked about is very crucial for you. And that's what that's really what I'd like to know with more specificity. Okay. Taking a step back from the particular cases that the director testified that when a court order issued, he assigned staff at the highest level to make sure that the specific care needs of the child were understood and that somebody was working with providers to find an appropriate placement for each use. And so these are the steps that were testified to with respect to each hearing. Ma'am, I know he said he assigned people, but my question is, what did they do? What did the DCFS do after the entry of the order in an effort to adequately place these children? Now, you know, he told somebody, but if they didn't do anything, you know, well, but they were making efforts. The evidence at the hearing was that they were doing everything that they could to to secure a place. And again, with respect to testify that she was working. There were the testimony was that there were 2 agencies that were actively looking for foster care placement and testified that she was working with a statewide recruiter to identify potential foster care placement. And also that the department was looking into potential non specialized foster homes where they believe that they could provide services that would allow that home to provide the adequate level of care. Oh, well, but you're not able to tell us when that took place or whether it was before or after. So, could we talk about CJ? Yeah. CJ, the order to properly place was entered on March 31st of 2021. The contempt hearing didn't take place until March the 17th of 2022. There was an initial order for placement in 2021 and the testimony at the contempt hearings throughout 2021. Uh, CJ was referred to 9 residential facilities within. That all declined placements in August 2021, a neuropsychological examination of CJ was done to try to better understand his needs and provide additional information to facilitate placement. And then, in January 2022, a secure care assessment was done and CJ was approved for secure care placement. Once that approval was secured, CJ was referred to 7 secure care programs, but all declined the referral. Um, at the time of contempt, 3 of the out of state placements that had declined referral had cited concerns about potential substance misuse. And so the department ordered a substance abuse assessment so that it could, with the results of that assessment, go back to those 3 facilities that had declined on that reason and work with them directly to determine whether they could meet CJ's needs. So, those are the steps taken. He'd been rejected by both in state and out of state referrals. At that point in time, at the time of the contempt hearing. At the time of the contempt hearing, yes, that's correct. He had been so he was placed. He was in the. He had been placed in the, where his caseworker testified that he received all of the services that that would be available to him in a residential facility. So, you are arguing that that it was. An alternative placement in the that would be that would satisfy the. Trial courts order for placement on a permanent basis. Not on a permanent basis, it wasn't interim placement and the department was attempt was looking to secure a longer term residential placement or a secure care at that placement for CJ. But in the meantime, it was, it was a placement where he could receive the services that he needed to help transition into his longer term placement. Well, I'm going to, this is a little bit, but is it reasonable for the trial court to wonder? Why it took over a year means that this is a population of kids that is charged with caring for in similar circumstances. This isn't I wouldn't expect that this is an isolated incident. So do you think that more than a year to find placement is something that the trial court could consider in determining whether or not the failure to follow its order was willful. At the time frame certainly could be relevant, but the circuit court itself acknowledged that the, that the staff were working very hard and we're doing everything that they could to find a placement for CJ. That was a, that was a finding of the trial court. Oh, well, then how how is it to the trial court also found that Smith ignored its orders. If you're doing everything you can to place the child, how can it be said that he ignored the orders? And that's why these orders are, but we also raise the argument that the orders are an abuse of discretion because they're not, they're not aimed at the specific efforts that the circuit court acknowledged the specific efforts that department staff was making to place the child in a place of care. Place each use and that with the, and that they were doing the best they could with the resources available to them, but argued that in a sense that that the, that the system was quote broken that the Rube Goldberg bureaucracy of the system made it impossible to place the view. All right, we still have a few more to go through what was going on with the order was entered on February 3rd, 2022. Contempt hearing was on March the 24th, 2022. What were you doing between those dates to place the child. The evidence that the contempt hearing was that she was referred for placement. With 7 residential programs, which testified were all the programs within the state that could accept her that that could meet her needs. At the time of the contempt 3 of those referrals were still pending and the department continue to work with its providers to identify available placements to step down the efforts that are they talked about was the 3 referrals that were still pending. Were they appropriate placements. They were, and in fact, her recommendations, they were, and in fact, she was ultimately placed at 1 of those places. All right. What about J. S. Okay, J. S. Contempt proceeding within April of 2021 and the department testified during those proceedings that it had just recently obtained a neuropsychological examination of J. Which was important to help me understand his needs so that he could be referred for placement. The testimony was also that he was referred for placement with every in state facility that the department believes could meet its needs as well as to non secure out of state facilities. The department at the time of the contempt was working directly. The testimony was that the department was working directly with 1 of those facilities to try to secure a placement for J. What was the date of the contempt, the, the order for placement of J. S. The order, the placement was ordered by March 25 March. All right. What is the circumstance with L. R. The order was entered. Let's see. March, the 25th, 2022, and the contempt hearing was on May the 12th. Yeah. What was the department doing between those 2 dates? Testified that the department had referred a lot of replacement to 6 residential facilities, but none could accept her. Due to reports of aggressive behavior or concerns about her, the ability to meet her needs, given her history of sexual abuse and potential sex trafficking. The department referred her for also refer to her placement at a specialized placement for sexual abuse victims, but it couldn't consider her due to staffing issues. And George also reported that the department sex trafficking advocate had interviewed our and referred her for victim awareness and education services and was exploring whether L. R. could be placed with any with a specialized residential program for victims of sex trafficking. Okay, that's all 8 of them. I believe we've gone through. So, to summarize, Miss Hanson of the 8 children at issue in these consolidated appeals, how many of them now, as we sit here today are in a placement that is satisfactory to judge Murphy. All 8 of them have been placed and judge Murphy has purged the contempt with respect to 7 of the children and there's 1 still outstanding. There's 1 contempt order that's still outstanding, but that child was placed which 1. That is L. R. And what is the reason that that particular child is sort of an outlier and has not been contempt is not encouraged yet. The judge Murphy transferred outside of our record, but judge Murphy transferred that case back to the, what I call the transfer in court, the original court that had the case. So, the non severe called or sort of regular call. Yeah. Yeah. And the, that trial court found that the placement that L. R. placement was necessary and proper. But there was, I believe the public already filed a motion to reconsider that. And to be honest, I'm not sure if that motion is still pending. I just know that that I don't believe that the contempt was purged as of yet. We want to discuss about that. I defer. Yeah, I know. I just want you to summarize your arguments now, because we let you run over about 8 minutes. So go ahead. Well, we covered a lot of what my argument was, and that is that the department was consistently making efforts to place these use. In fact, the circuit court acknowledged the efforts that the department was making the place each use and recognize that it wasn't. That it wasn't that the, that the department wasn't trying to place the juice that attributed the inability to place these use. And what it seemed to be systemic issues with the placement process. I would also note that. The director doesn't have sole control over whether a child is placed as we set forth in our papers as well. Every placement is subject to a facility independent decision or a foster homes independent decision about whether they can safely accept a use for care within their facility or within their home. And because. Because contempt is only proper when when the alleged contender can can comply has the ability to current ability to comply and the current ability to purge contempt. Contempt was simply not an appropriate vehicle in this case. For those reasons, and those set forth in our breach, we would ask that the contempt orders be vacated. Okay, we'll give you some time and rebuttal. Why don't we take the issue of JC as an apple before we get to the public guardian who's got more to talk about. So, Mr. O'Connell, go ahead. Thank you very much. May it please the court. I represent the adoptive mother of the minor JC in JC's case, there's no issue that the department violated the trial court orders to place JC In a clinically appropriate placement. The issue is rather whether the trial court either abused its discretion and finding the the department in contempt. Or if the trial courts findings were against the manifest way to the evidence. I submit that using either standard the trial court made proper findings. And I believe that the facts in this case support the trial. The findings that the trial court had made JC's facts are unique. The state initially filed a petition for adjudication and wardship on September 28 of last year. Alleging that JC had been psychiatrically hospitalized due to self harming behaviors and threats against mother. The record in this case indicates that JC had a mental health diagnosis of anxiety disorder, depression, bipolar disorder, ADHD, and schizophrenia. JC had a history of being hospitalized due to aggression. In this case, through no fault of mother, mother simply could not safely maintain the child at home. This was a dependency case from the very beginning. And it was clear that this child needed residential care. On December 10 of last year, the court made no fault dependency findings consistent with the allegations made in the original petition for adjudication of worship. From the day JC's case came into the system in September of last year, up until February 10 of this year, JC had undergone 24 placements and as a record indicates JC was finally placed Mr. O'Connell, I'm going to hold you to the same thing I said to the Assistant Attorney General. We're concerned with what occurred to place this child from the date the court entered its order, which I believe was December the 30th of 2021 and the date of the contempt hearing, which was February 17th. What did the department not do that it should have done? Well, we know that as of at least February 10th that JC had undergone 24 placements, which I would, and that's within five months, which I would submit as unreasonable on its face and quite frankly. Unfortunately, you can't consider anything that occurred prior to the date of the order as being a violation of the order. So what is it they didn't do that they should have done after December 30th of 2021? Well, from at least that date up until June 28th, the child still underwent a number of placements. It took that long to place this child in a clinically appropriate placement, which I just think on its face is unreasonable. I heard the department arguing that it was working hard on JC's placement, but the fact that there were so many different placements rebuts the department's contention that it was working diligently to find a proper placement for JC. And I think based on the statute cited and the briefs, the department has a duty, an affirmative duty to place the child in a clinically appropriate placement. I submit that in December of last year, the department knew that this child needed residential care, but instead of placing her in a residential program right away, it bounced JC around from placement to placement until finally in June of this year, an appropriate placement was located. I just think it was totally unreasonable. Let me ask you this question. At the time of the contempt hearing, is it true that JC was hospitalized at that time? She was in a hospital? Right. I see that on December 30th, the trial court entered an order requiring DCFS to remove the child from Lori's hospital by January 4th of 2022. And on January 6th of 2022, the trial court entered another order requiring DCFS to remove the minor from Lori's hospital to a clinically appropriate placement within 24 hours. And I think the consensus with everyone was that the placement in the ER was not a clinically appropriate placement. Okay. At the hearing, were there three pending referrals at the time of the hearing that had not been resolved? Your Honor, it's my understanding that they were trying to locate a residential placement at that time. Well, then if they were trying to locate a residential placement at that time, how in heaven's name were they found to be in willful, concomitant violation of a court order that was entered on December 30th, 2021? Well, I think ultimately the trial court was responsible for this child. Nothing was getting done in a timely manner. As I mentioned, it took until June 28th of this year to place this child in an appropriate setting. I think you can't say in one breath they were doing everything they could do, and in the next breath say they were in willful violation of a court order. How does that work? I mean, the two seem to be contradictory. Well, I think as I mentioned, on its face, I think the sheer number of placements that J.C. had just wasn't reasonable. They were arguing that they were hardworking. It just rebuts that contention that they were hardworking. It shouldn't take that long to place a child in an appropriate setting. I think this bears out in the record. If a child is moved from placement to placement, that's simply not in the best interest of a minor. You can't keep moving a child around because... Now, Mr. Ocampo, I don't think anybody disputes that, but we're here on a question of whether the director was appropriately held in indirect contempt for violating a specific court order. And I'm back to the question here. If you say they're doing everything they can to find an appropriate placement, you can hardly turn around and say that he was in willful contempt of having failing to do so, or in the words of the trial judge, he was ignoring the order. Your Honor, I would just once again submit that just based on the sheer number amount of placements, it really is a willful act by the department. Mr. Ocampo, so your argument, if I understand it, is that they couldn't possibly have been doing everything they could given the number of placements that this child underwent between the time the order was entered and the hearing. Is that what you're saying? I mean, you haven't done it, but that's what I'm understanding you to say. Yes, Your Honor. That is my argument. I just believe that they really did not do everything possible. It should not have taken that long to place this child in an appropriate setting, especially in light of the fact... Let me ask you another question, which I asked your opponent, Ms. Hanson. I like specifics because words matter, and saying we did everything we could, I'm not sure what that means. So I'm asking you the opposite of that. What else, other than what the records suggest they were doing, should they have been doing? I think that the department knew that this child had special needs back in September of last year when the petition was originally filed. They knew that this child needed a residential placement. The records show that that SIP was done in December. Why it took that long to have a SIP, I don't know. But I think the record is clear. A residential placement was necessary for this child. And the fact that this child moved around so many times... That wasn't my question, Mr. O'Connell. I want to know what specifically are you asserting they should have been doing, other than what they claim that they were doing. So just, if you can give me some specifics, as I asked Ms. Hanson, that would be helpful to me as well. Judge, I believe that the department should have been complying with the court's orders. What does that mean? Of course we agree that people should comply with court orders, but I'm trying to be more specific. What does that mean? I think it was the department's job to find a clinically appropriate place for this child. And this simply was not getting done in a timely fashion. And I think this is so important that the child was at risk for many more traumatic moves if the trial court did not take immediate action and intervene in this case when it did. I would just submit to the court that the contempt findings and orders were proper, based on the facts of J.C.'s case. Mr. O'Connell, let me ask this a different way. Eventually this child was placed, correct, in an appropriate environment? Yes, Your Honor. Was there any evidence at the contempt hearing demonstrating that the department knew on day one of the existence of this particular placement location, but instead fished around to all sorts of other places in an attempt to avoid something, who knows what cost? I don't know. And then only after the pain of contempt got the placement that they knew was right all along? Well, at least in the J.C.'s case, taking from September of last year to June of this year was simply too long. This child needed a placement right away. It wasn't happening. Okay, thank you, Mr. O'Connell. Public Guardian, do you want to address your seven people? Yes, Your Honor. I'm Public Guardian, Assistant Public Guardian Cass Plain, and I represent the eight children in this case, who range in age from 12 to 17. And we're here today, of course, because Director Smith did not comply with the court's orders to place these children in clinically appropriate placements. Director Smith allowed these children to languish in acute psychiatric hospitals for weeks, months, and in one case, almost a year. Counsel, before we have difficulty with this argument, we are concerned with what the director did or did not do from the date the order was entered until the date he was held in contempt. That is the only relevant time period. A contempt citation cannot be based on any activity prior to the entry of the order that's allegedly violated. So what is it that you contend supports any notion that he was ignoring or that the DCFS was ignoring the trial court's orders between the date it was entered and the date he was held in contempt? The date these orders were entered, there is no testimony at the contempt hearing that Director Smith or any of his agents used funds to enter into contracts with residential treatment centers that did not have contracts with DCFS, or offer additional funds to the facilities these children were referred to, to purchase an additional bed or to hire additional staffing. There was no witness that testified that Director Smith's agents offered funding from the time of the placement order until the time of the contempt order. In the case of minors where referrals were made after the entry of the order, but the child had not been declined at the time of the contempt hearing, are we safe to assume that he necessarily would have been declined because he wasn't offering money? Not just that, Director Smith was really just kind of going through the motions because he repeatedly referred these eight children to placements he knew would not accept them. How do you know that? Because he referred 11-year-old TB to a residential treatment center that only accepted children 12 and older. And he referred JH to three residential treatment centers that didn't have any openings and to another one that only accepted children that were older. Using that as an example, did he know at the time of the referral that that particular agency did not have openings? Not at that particular time, but DCFS is aware of which residential treatment centers have openings, which do not. And in addition, he referred them to placements that he knew wouldn't take them. DCFS has contracts with all these residential treatment facilities, so they know the IQ, the special needs, the age. They know all these things as to whether or not these placements are going to accept these children. And yet, Director Smith continually referred these children to placements he knew and his agents knew were not going to accept them. So your argument really is that the willful conduct comes from doing what they had always done, which didn't work in the past and they didn't do anything specific for these to comply with the specific orders as related to each of these kids. And I think that's what you said in your brief, but is that what you're saying now? Yes, Your Honor, that is exactly. And there are many other examples. For example, 13-year-old L.R. is a sex abuse victim who has sexually reactive behavior. Ma'am, so that we can keep some order here, let's take these kids one at a time. Tell me about R.A. What is it that the director failed to do in an effort to place R.A. after the entry of the order requiring placement in residential care? All right. R.A. was accepted at both Children's Home and Hoylton. However, he was wait-listed at both those placements, meaning that he wasn't going to get in. Those are the two placements. What do you mean it means he wasn't going to get in? He was on a wait list. These facilities, it's apparent from these facilities that they have rolling admissions, beds. I mean, you know, so they may be full up today, but when they discharge somebody tomorrow, they got an open bed. Now, it's my understanding that at the time of the contempt type hearing, R.A. had been placed, referred to CHOP in Hoylton, and both of those were adequate facilities based upon the recommendation for him. Is that correct? Yes. But Director Smith himself admitted he is responsible for finding placements for these children, not referrals, not matches, and not wait lists. The wait lists were indeterminate. Hold on a second. In order to place somebody, you got to refer them. And then once you refer them, they have to accept them. And so are you suggesting that he can wave a magic wand and the child can be in a placement immediately? No. What I'm saying is he could have done what, you know, Section 505. What more could he have done? Offered additional funds. Well, wait a minute. They hadn't been turned down. No, no. For R.A. CHOP or Hoylton? Hoylton, yes, but he wasn't placed there at the time the court ordered him to be placed by a specific date. He was not placed by that specific date. And then. Wait a minute. What would offering additional funds have done to make him be placed by that specific date? Well, for example, if it was a staffing issue, Director Smith could have offered additional funds for additional staffing. Hypothetically, was there some clarity? Again, I really want specifics because each of these cases are considered on the specific facts of that particular case. So is there some indication that offering additional funds, as you just suggested, would have opened up a spot for this child, for R.A. at that time? It could have, absolutely, because. Is there evidence in the contempt hearing supporting that assertion? Well, the witnesses were all asked, did Director Smith or his agents offer additional funding to create, for example, a one-on-one aid for this particular child so that he could be, R.A. could be accepted? And the answers were no, that did not happen. Where was R.A. ultimately accepted at? Hoylton. So in other words, one of the referrals that was still pending and unresolved on the date of the contempt hearing, which was Hoylton, was actually a place that did ultimately accept R.A. He was on the wait list for Hoylton, so it wasn't just a referral. He was accepted there, but it was an indeterminate wait list. Nobody could testify how many days, 100, 150, 200, how many days he was going to have to wait to get the placement. The court order was that he be actually placed, not placed on a wait list. So your argument is that if he was referred to a facility that had a wait list, it was the obligation of VCFS to find another facility that didn't have a wait list. Is that what you're saying? If it met his needs, or offer additional funding, or create a placement. You keep talking about additional funding, and I'm trying to figure out what does that have to do with ensuring placement in a particular facility. If the facility doesn't have space, what will offering additional funding do? Also under Section 505-5H of the Children and Family Services Act, Director Smith is obligated to create placements if ones do not exist. How does the DCFS create placements in private institutions? How do they do that? By entering into a contract, an individual contract, or a contract with an agency that DCFS currently does not have a contract with. Contract requires two sides. What if there's no one to agree to that arrangement? I'm sorry, Your Honor. Now my question is, the contract requires an offer and an acceptance. You're assuming, without any support in the record, that there's an agency out there that would say, oh yes, we'll expand the scope of our services to include this particular type of need for a price. In order to show that he did not willfully disobey these court orders, he had to at least make these efforts under Section 505-5H. He was required to at least make the efforts, and he did not do so. No testimony from the time of the placement orders were entered until the contempt findings. There was no testimony that he did any of these things, such as offer additional funds for additional staffing, an additional staff person. Perhaps a one-on-one aid that could have been assigned specifically to RA so that he could have been accepted at this facility. All right, tell me about TB. What is it that occurred with TB? She was beyond medical necessity for 308 days. No, I'm not interested in whether she was hospitalized without medical necessity prior to the date of the entry of the order. The order in this case was entered on February 3, 2022. And it entered an order requiring Smith to ensure that TB was placed by 3.15 p.m. seven days later. Right, because she was in an acute psychiatric hospital decompensating. And from that time, she was rejected from the referrals for the residential treatment centers. And at the contempt hearing, the DCFS official testified that they were going to try to get her into Hepzibah. I think the testimony was that they were working with Hepzibah to create a space for TB in a diagnostic program. Right, it's not a residential treatment center. It's a 90-day diagnostic center. It only accepts children until they turn 12. What was the date of the last declination by a facility to which she was referred? That I don't know, Your Honor. Okay, what about AC? Right, AC was referred to numerous specialized foster care agencies, including agencies that didn't have openings for her. So she was 86 days beyond medical necessity. And DCFS indicated that she needed specialized foster care in December of 2021. And she was referred to very many specialized foster care agencies. However, because of her special needs, many of the foster parents wouldn't even interview her. And so... So Ms. Payne, what would DCFS, in your view, be expected to do in those circumstances to show compliance or at least active efforts to comply with Judge Martin's order? Right, to offer funds to these specialized foster care agencies to create placements for her, specific for her, or offer more funds to these individual foster parents so that they could manage her behavior or finally accept her into their home. And there was no testimony that that happened. As of February the 24th, was it not true that she was placed on a wait list for therapy at Advocate Trauma Treatment? Yeah, she needed trauma-based therapy for many, many months, and she did not receive it. But there's not many months in between February 10th and contempt on March the 3rd, are there? No, but the trial court held Director Smith in contempt because she was not placed in a clinically appropriate placement by the date that was required in the court order. In 14 days? In 14 days, yes. The trial court found that he ignored the court's order. So, in other words, DCFS didn't do anything to attempt to place this child or find an appropriate placement between February 10th and March the 3rd. That is what the court's finding were, yes. And the court was fully within its right to do so because she had been referred to many different foster care agencies that didn't accept her, and there was no timeframe as to when they would accept her. And as Director Smith admitted, as I stated before, he is required to find clinically appropriate placements, not wait lists. Well, it occurs to me that your theory is as long as the court order is violated, he's in contempt. No, he has to show that he was not willful. Yeah. A violation of a court order is prima facie evidence of contempt. I understand what a violation of a court order means, but you can't hold somebody in contempt merely because the order is violated. There's got to be a situation where he's willful, willful and wanton, and consummations conduct. And what I'm at a loss is if a child has been referred to an agency or facility that fits the child's recommendations, and they don't have space for the child, but they put the child on a wait list, and you've got a window here of 14 days to do all this under this order. I mean, I'm at a loss to understand why it necessarily is willful, wanton, consummations conduct in violation of a court order. Because the court order is for a specific date, and the child was not placed then. So in other words, no matter what the reason is, if it's not done by that day, he's in contempt. And that boils down to violation of a court order by itself equals contempt. No, he did not do everything he could. What didn't he do that he should have done within those 14 days while the child was on a wait list? We're talking about AC? AC. Yes, offer additional funding, additional funds, contact these specialized foster care agencies, offer additional funding to the agencies to see if additional funding could have purchased additional services for this particular child so that she could be accepted. Is there anything in the record of the contempt hearing that shows that these other agencies out there, that if you would have waived a bunch of money in front of them, they would have taken the child, were ready, willing, and able to do so? No, because he didn't try. But it's so speculative. I agree that it's a common belief that money usually gets people motivated. However, I don't see anything in the record that really suggests it's clear that DCFS was spending a lot of money to house these children where they were inappropriately. And your theory is, had they used that same money in a different way, maybe they could have moved the kids to a more appropriate setting. That's how I understand your argument, right? Correct. As Justice DeLoy asked you a few minutes ago, was there any indication that there were other entities out there who may have been enticed by this money? I mean, it sounds so speculative. Well, Director Smith is required under Section 505-5H to create a placement for a child if one doesn't exist, including through purchase of services, meaning contracts, individual contracts, or offering funds to these specialized foster care agencies to, as I said, provide more services for the child or additional funds to the foster parents. Children who are beyond medical necessity in a psychiatric hospital, DCFS has to pay $1,000 a day for every day that they're beyond medical necessity past 30 days. So those funds could have been used to create additional placements, to offer additional funding to these specialized foster care agencies. But that was not done. Wait a minute. Do we know that it wasn't done? Yes, because these questions were asked of all the witnesses. What did Director Smith do? Did Director Smith contact any of these foster care homes to see if they would have taken this child? Is there any indication in the record that if he had or offered money, one of them would have accepted her? No, because he didn't offer the money. But he is required to use purchase of services. So in other words, if the child is on a wait list at one institution, rather than waiting to determine when a bed will open up at that institution, the child gets in, he's got to run out and offer money to somebody else. Well, right. These children have been waiting for a long time. Their recommended placements by DCFS were months and months and months before these contempt hearings, which the trial court took into account. And wait lists, they're indeterminate. Exactly right. It's exactly right. The trial court took into account what was going on with these children before it ever entered its order. And based upon what happened to these children prior to the time it entered its order, went into the calculus of whether he was going to hold this man in contempt of court. No, the trial court's orders actually said, I am not punishing Director Smith for past conduct. It is because he has failed to comply with the court orders or ignore the court orders or refused to comply. In each one of those court orders, there's two and a half pages decrying the bureaucratic malfeasance of the DCFS over years. Now, what does that have to do with whether the man violated a court order? It's just setting the stage for why some of these children couldn't be placed. It wasn't the reason why. If you look at the narrative court orders, it is, I am finding Director Smith in contempt of court because he did not place this child by this date. Okay. But actually what it did say is he ignored the order to place the child by that date. He did not comply. No, it says ignore it. I'm reading the letters. I have all eight of them right in front of me. It says he ignored the orders. That's why he was being held in contempt. And my question is, how can it be said that he ignored the orders if these children were in fact referred to appropriate placements and those placements were still pending on the date of the contempt hearing? What justifies it? The burden was on Director Smith to show that he was not willful. Wait a minute. There is no question, factually, that these children were referred and the referrals were still pending on the day he was held in contempt. That's not in dispute on the majority of them. She was rejected from all placements. Yes, we understand that. But what had been attempted from the date the court order was entered until the date he was found in contempt? What had the DCFS attempted to do? In the case of CJ? LR. LR. Nothing? No. No, she was rejected from all the placements, and there was no testimony that Director Smith created a placement for her, offered funds to the facilities that rejected her. I think there was testimony that a sex trafficking advocate had been working with programs in an attempt to customize a placement for LR. But that's not a placement. In one breath you tell us that if there is no placement available, he's got to create one. Well, if working with a sex trafficking advocate in an attempt to customize a placement, how is that not in compliance with what he's supposed to do statutorily? Well, she was referred to Indian Oaks but rejected from Indian Oaks. It addresses children with sex trafficking issues. So, can I ask, it seems to me like you're, you're really taking issue with the methods that DCFS, you're not saying they didn't try, you're arguing that what they tried wasn't effective so therefore it was willful and wanton, it was willful conduct. That's what it sounds to me like you're saying, because they didn't do the specific things that you believe would have yielded placement. But is that the standard for determining whether the conduct was willful? It sounds to me like that's what you're arguing. I'm not arguing that Director Smith tried. I'm saying that he didn't try. No, you're arguing that the things that he did aren't consistent with what you think would be efforts that would comply with the judge's order. And because there's a disparity between what you think is appropriate and what he actually did, then that in and of itself is willful and wanton, is willful conduct. That's what it sounds to me like you're saying. The statute requires him to create a placement if one doesn't exist. He didn't do that. What if he can't create one? Well, he can use purchase of service. He can go to other residential treatment facilities in the state of Illinois that he doesn't have a contract with. He can offer additional funds for additional beds. Which brings us back to what I was saying before. Obviously, if you try certain methods, you're not going to know whether they work immediately. And in some of these time periods, they were pretty short time periods, a week or so. So if you don't know that it works, or it's not going to work, and you haven't had time to try something else, how is that willful? Well, the trial court here indicated that several of these residential placements had 20 to 30 children who needed to be discharged from them before a placement would be available. So, for example, the wait list for RA, it was indeterminate, but it took RA until April of 2022 to actually be placed in a clinically appropriate placement. Director Smith always had the ability to place these children appropriately, and that is shown by the fact that all eight of these children were placed eventually. Well, I mean, they were placed eventually because the places that they were referred to, beds were freed up because other children were discharged. But that doesn't mean that the child could have been placed within the timeframe that the trial court ordered. Well, for example, CJ was rejected from numerous placements, and there were placements pending. But it wasn't until Director Smith entered into an individual contract with a residential treatment that was secure in Florida that he actually got the placement. This was an independent contract, an individual contract just for him. And it also included a behavioral modification specialist, funding for a behavioral modification specialist so that this facility would take him. And the date of the status hearing on CJ, I think April 14, 2022, his whereabouts were unknown. How do you place a child whose whereabouts are unknown? But very soon after he ran away. Right. Very soon after he ran away, he was found. He was placed in various placements, including welcome centers, and he was found. And then he was placed in a psychiatric hospital. Okay. Counselor, I think we let you run off a little bit. Why don't you bring your remarks to a closure? These eight children desperately needed clinically appropriate placement, and they waited for months and months. And only after the contempt orders were entered did Director Smith finally place them. The public guardian, on behalf of these eight children, asked this court to affirm the contempt orders. Thank you. Thank you. Thank you. Rebuttal, please, Ms. Hanson. You're on mute. Sorry about that. I would just briefly address a couple of the points that the public guardian raised. First, with respect to funding, there was no, as the court recognized, it was purely speculative that funding a specific placement or funding offering more money to a foster home would provide additional, would open up a foster home or a residential placement for these youth. And it was actually contradicted by the testimony. The director testified that money generally wasn't the issue. The issue with respect to these types of placements is whether a facility or a foster peer placement has the acuity to meet the needs of these children. And I would also add that staffing shortages were a significant issue with respect to placements of these youth, and that was well documented in the record. And so the suggestion that they, you know, that they could have just spent more money and then there would have been, you know, additional staffing or the support services needed, that just isn't borne out in the record. I would also like to address the public guardian's argument that the director was obligated to create a placement. The department doesn't run, doesn't operate residential care facilities. What the statute actually requires is that the department create an appropriate, individualized, program-oriented plan. And it's the evidence that we presented to make it clear that is what the department, that's what department staff and agents were doing. They were working with their facilities. They were concurrently providing services. They weren't allowing these kids to languish in psychiatric facilities. Ms. Hansen, I want to ask, are you saying that if the department creates an appropriate plan, but doesn't do anything further to satisfy the statutory requirements? No, what I'm saying is that they were creating plans and they were implementing those plans. They were concurrently trying to provide for the child's needs and stabilize the child and understand the child's needs, while at the same time finding a residential placement. And placements were ultimately found for these children. They just weren't found within the time provided in the order. I would also note that contempt proceedings, it's a very limited remedy that's addressing an affront to the court. It's not specifically designed to vindicate the specific interest of the child. The inquiry is whether the director willfully and consummation refused to comply with these orders or wasn't taking steps to comply with these orders. And the evidence was clear that he was. And for those reasons, the contempt order should be vacated in all of these cases. Counsel, thank you very much for the arguments. And the court will take the matter under advisement with an opinion to issue in due course. Thank you.